COHEN BROTHERS MANUFACTURING Co., INC., Respondent, *v.* EDMUND WRIGHT-GINSBERG Co., INC., Appellant.

First Department, November 30, 1923.

Sales — action to recover on guaranty of payment of purchase price of goods — consideration — reversible error to refuse to charge that if verbal agreement to guarantee payment was not made until after order was accepted defendant is not liable — contract provided when rejection of goods might be made for defects — error to charge that goods must be rejected within reasonable time after delivery — Personal Property Law, § 129, not applicable.

In an action to recover on a written guaranty of the payment of the purchase price of goods which was executed after the goods were sold, it is reversible error for the court to refuse to charge that if a verbal agreement by the defendant to guarantee the payment of the purchase price was not made prior to the sale of the goods, the defendant is not liable, where it appears that the question of consideration is one of the issues in the case.

It is error to charge that the goods must be rejected by the buyer for defects within a reasonable time after delivery, where the contract between the parties stipulates as to the time when the buyer may reject the goods for defects therein. Under such a contract section 129 of the Personal Property Law, which provides in effect that the buyer is deemed to have accepted the goods, when, after the lapse of a reasonable time he retains the goods without intimating to the seller that he has rejected them, is not applicable.

APPEAL by the defendant, Edmund Wright-Ginsberg Co., Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 18th day of May, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office on the 22d day of May, 1922, denying the defendant's motion for a new trial made upon the minutes.

First Department, November, 1923.                    [Vol. 207

*Allen R. Memhard* [*Samuel Seabury* of counsel; *George Trosk* with him on the brief], for the appellant.

*Nathan Friedman* [*Edmund L. Mooney* of counsel; *Terence Farley* with him on the brief], for the respondent.

Dowling, J.:

This action was brought to recover the sum of $17,434.32, with interest, the agreed price and reasonable value of merchandise delivered to defendant in behalf of one William Heller on an alleged guaranty as follows:

"*Nov.* 14, 1919.

"Cohen Brothers,

"16 West 32nd St.,

"City.

"Gentlemen.— We notice order copy to Mr. Heller for 1500 pounds of silk at $13.50 a pound and 3500 pounds at $14 a pound which purchase we hereby guarantee.

"Yours very truly,

"EDMUND WRIGHT-GINSBERG CO. INC.,

"E. Wright,

"*Secy. & Treas.*"

It appears that about October 17, 1919, William Heller entered into a contract with the plaintiff for the purchase by him of 3,000 pounds of raw artificial silk cloth at thirteen dollars and fifty cents and at fourteen dollars a pound. This contract involved over forty thousand dollars, and called for delivery during November and December, 1919, "complete by Dec. 31st, 1919." On November 5, 1919, that contract was canceled by agreement and the parties thereto entered into a new contract whereby Heller agreed to buy 1,500 pounds of raw artificial cloth silk, style "Minuet," at the price of thirteen dollars and fifty cents per pound, terms cash, less two per cent, to be delivered at once during November, and 3,500 pounds of the same material and of the same style, at the price of fourteen dollars per pound, terms cash less one per cent, to be delivered during November and December, and to be completed by December 31, 1919. This new contract involved over seventy thousand dollars.

At this time defendant was the factor for William Heller, and he had an office with them, bearing the sign "William Heller Department." What occurred at the time this contract of November fifth was entered into has developed into a bitterly disputed question of fact between the parties. Plaintiff contends that Mr. Iser P. Cohen, president of the plaintiff corporation, telephoned Mr. Edmund Wright, secretary and treasurer of defendant, and

Cohen Bros. Mfg. Co., Inc., v. Wright-Ginsberg Co., Inc.   **201**

App. Div. 199]       First Department, November, 1923.

procured Mr. Wright's promise of a guaranty of the order before the order was written out, signed and delivered. The defendant contends no such telephone call was made, and that no such promise was given.

Mr. Iser P. Cohen testified: " Mr. Heller came into our place of business and stated that he wanted to buy some raw artificial silk cloth. He had had some of the same cloth from us prior to this date, and asked me the price. I told him what the price was. I think at that time the first price I asked him was $14 per pound, and he stated that he thought I should do a little bit better, that he wanted to buy 5,000 pounds, and we should let him have 1,500 pounds at $13.50 pound cash, less two per cent, and the remaining 3,500 pounds he would pay $14 per pound, cash, less one per cent. I told him that that would amount to something around $70,000, and I asked him who was going to guarantee the payment of it. He said ' Edmund Wright-Ginsberg.' I said: ' Just a moment.' I called my telephone girl to get me Edmund Wright-Ginsberg on the 'phone, Mr. Wright, and I told Mr. Wright that Mr. Heller was there and wants to give us an order, wants to buy 5,000 pounds of this artificial silk cloth, 1,500 pounds at $13.50 and 3,500 pounds at $14, which would amount to around $70,000 and Mr. Heller stated to us, that Mr. Wright, Edmund Wright-Ginsberg would guarantee the payment. Mr. Wright said: ' Go ahead and take the order, and we will guarantee it, and I will send you the guarantee by mail, confirm it.' Then I sat at the desk where Mr. Heller was standing, by my two brothers, and the order was written up by my brother, by my direction, signed by my brother and signed by Mr. William Heller.   *   *   * "

He further testified: " Just as my brother was just finishing signing his name, Mr. Heller stated that he wanted these goods charged to Foreign Textile Corporation, Edmund Wright-Ginsberg, and I asked him why the reason for that and he stated that that was merely a nominal name, but that was the way they ran that department down there. That was added on, put on afterwards by my brother. Q. By afterwards you mean after his signature? A. After he signed it, after the order was signed by both of us. Q. But was it at the same time? A. Right at that time, the order had never been taken off of the carbon copy, and that was added on there. Q. So that those words appear on the carbon copy? A. Absolutely."

A comparison of the original and the carbon copy of the order shows that the direction to charge to Foreign Textile Corporation (Edmund Wright-Ginsberg Co.) appears only on the so-called original, and is not upon the copy.

On cross-examination Mr. Cohen admitted his mistake, saying he so testified " because I thought the carbon was in between the two sheets when they were signed; " but he now realized it must have been taken out.

" Q. So, when this order, Plaintiff's Exhibit 1, was signed by your firm name, and by Heller, this reference to ' Charge to Foreign Textile Company ' was not on there? A. No, sir, it was not. Q. It was after it was signed that Heller suggested that you charge that to the Foreign Textile Company? A. Charge, and ship them there; yes, sir. Q. That was when he made that suggestion that you said, you would want a guarantee from Edmund Wright-Ginsberg Company, isn't that right? A. No, sir. Q. When did you make that statement? A. The minute he spoke about increasing the order, or making the order, giving us this order for the 5,000 pounds."

Mr. David Cohen, vice-president of the plaintiff company, testified: " Mr. Heller said: ' I want to give you a larger order on the artificial silk cloth,' and wanted the price. Mr. Cohen gave him the price. Mr. Cohen said ' Who is going to guarantee the payment of this order, it amounts to 60 or 70 thousand dollars? ' Mr. Heller said: ' Edmund Wright-Ginsberg.' At that Mr. I. P. Cohen told the telephone operator ' Get the firm of Edmund Wright-Ginsberg on the phone, I want to speak to Mr. Edmund Wright.' The conversation on the phone was ' Mr. Heller is here to give us a large order on some artificial cloth. It is quite a considerable amount of material.' He said ' You will guarantee it? Will you guarantee that order? ' Of course, I did not hear the other end, but then Mr. Cohen immediately stopped there, came back and told my brother [Aaron Cohen], ' Go ahead and write up the order. Mr. Eddie Wright will guarantee the order.' "

He further testified: " Well, after the order was all signed, and carbon copies taken out, and ready to deliver the yellow one to Mr. Heller, my brother holding the white copy, Mr. Heller made the remark, ' Boys, I would like for you to charge and send these down to the Foreign Textile Corporation.' * * * Mr. I. P. Cohen made the remark ' Who is the Foreign Textile Corporation? ' He said that. Mr. Heller made the remark: ' That is the way that Edmund Wright-Ginsberg handles that part of the business, so that we would prefer you charge them, send them down to them under that name.' "

Mr. Aaron Cohen, secretary of plaintiff, was present at the conversation and drew up the order in question. He was asked: " Q. Now, I want you to give in the regular order just what Mr. Heller said at that time and then give the conversation you heard over the

telephone? " He started to answer as follows: "After the order had been taken by us and signed by both of us —" when he was interrupted by plaintiff's counsel with the remark: " You are going along too quickly for me." The following then occurred: " Mr. Seabury: May I hear what he said? (Answer of witness read by stenographer.) Q. It will take about a minute to tell it, but you are going along much too quick for me. I ask you to tell what was said. You could not write before somebody said something. Mr. Seabury: Now, I object to that if your Honor please, as argumentative to his own witness. Mr. Mooney: Well, leave that out. Mr. Seabury: He has made a most important statement, there, and I think I ought to have the benefit of it, as I understand it, if your Honor will hear the stenographer read the answer. The Court: I heard it, it is on the record. Mr. Seabury: After it was signed, as I understand it, then the conversation took place. The Court: No. (Testimony under discussion was read by the stenographer.) "

The witness was then asked to tell the details of the transaction with Heller, and proceeded to recite it. He then corroborated his brothers as to the telephone conversation taking place with Wright. He testified: " Q. You cannot tell what Mr. Wright said, because you couldn't hear the other end of it. You tell what your brother said, on that telephone? A. My brother said that, ' Mr. Wright, Mr. Heller is here, wants to give us an order for 5,000 pounds of raw artificial silk cloth, and I want to know if you are going to guarantee the payment of the order, if I accept the order? ' Q. Then, something else happened on the telephone which, of course, you did not hear; you did not hear the response, but after that had happened, what did your brother next do? A. He dictated me to write the order. Q. And did he say anything, either into the telephone or to you two persons as to what had happened on the telephone? A. He said in the presence of both of us that Mr. Wright had agreed to guarantee the order. Q. Now, was it then that you commenced to write the order? A. Yes, sir."

And further: "After the order had been all signed up, and Mr. Heller was preparing to leave, he requested that we put these instructions on the bottom of the order, to be charged to the Foreign Textile Corporation, and the goods were to be delivered to the Foreign Textile Corporation, care of Edmund Wright-Ginsberg Company. They were put on there for the purpose of the shipping department to instruct them how to bill and deliver the goods."

But on cross-examination this witness testified: " Q. Mr. Cohen, you remember when Mr. Heller called on you and your brother on November 5th? A. Yes, sir. Q. And you remember that in that conversation a reference was made to a contract that

was then outstanding? A. Yes, sir. Q. Of the 17th of October? A. Yes, sir. Q. Previous, don't you? A. Yes. Q. That called for some 3,000 pounds of goods; that is right, isn't it? A. Yes, sir. Q. And Mr. Heller said he wanted to give you a larger order, didn't he? A. Yes, sir. Q. And then you wrote out, as I understand, this order, on Plaintiff's Exhibit 1? A. Yes, sir. Q. And there was a carbon sheet? A. Yes, sir. Q. And underneath it was this order, Plaintiff's Exhibit 2? A. Yes. Q. The duplicate that I hold in my left hand? A. Yes, sir. Q. And then you signed that, Cohen Brothers Manufacturing Company? A. Yes, sir. Q. And then Mr. Heller signed down there, didn't he? A. Yes, sir. Q. And after that was done and only after that had been signed by both parties, a reference was made to having the goods charged to and delivered to the Foreign Textile Company, wasn't it? A. Yes, sir. Q. And then that was written on that contract or on that paper? A. Yes, sir. Q. Written on by you? A. Yes, sir. Q. And then was it your brother that first suggested that there should be a guarantee, or Mr. Heller? A. My brother. Q. You are sure of that? A. Absolutely. Q. Mr. Heller did not offer and say: ' Mr. Wright is willing to guarantee this amount? ' A. My brother requested it. Q. Your brother requested it? A. Yes, sir. Q. Requested it as soon as the suggestion was made, that the delivery should be made to Foreign Textile Company? A. Yes, sir. Q. And then you called up or he called up on the telephone, asking for Mr. Wright, didn't he? A. Yes, sir. Q. And then you heard him talk to someone over the telephone? A. Yes, sir. Q. Are you quite sure that is right? A. Yes, sir. Mr. Seabury: That is all."

William Heller, for defendant, testified: " Q. After the contract was signed by Cohen Brothers and signed by you, was anything then said in reference to the Foreign Textile Company? A. After I had received my copy of the contract and we had talked a little further, I told Mr. Cohen that these goods were being purchased for the account of the Foreign Textile Corporation. Q. And what did Mr. Cohen then say? A. Mr. Cohen then said: ' I would have to have a guarantee.' Q. What did you say? A. I said: ' I would try to get Edmund Wright-Ginsberg Company to guarantee the account.' Q. Was there any telephone call put in then, in that office by you or by any of the Cohens for Mr. Wright? A. There was not."

Edmund Wright, for defendant, testified that he did not have any telephone call from any of the Cohens on November fifth. On or about November 7, 1919, Wright says he was told by Heller that he had bought the 5,000 pounds of silk from plaintiff; and

Cohen Bros. Mfg. Co., Inc., *v.* Wright-Ginsberg Co., Inc.  **205**

App. Div. 199]        First Department, November, 1923.

thereupon he wrote the following letter, which plaintiff offered in evidence as part of its case:              " New York, *Nov.* 7, 1919.

" Cohen Brothers,
        " 16 West 32nd St.,
                " City:

" Gentlemen.— Mr. Heller tells us he has purchased 5000 pounds of artificial silk. Upon the approval of the quality by Mr. Heller we shall be glad to give you our guarantee, and we ask that you hold the matter in abeyance until next Wednesday or Thursday advising us to that effect.

" Yours very truly,
                " EDMUND WRIGHT-GINSBERG CO. INC.
                                " E. Wright
                                        " *Sec'y & Treas.*"

On November twelfth plaintiff wrote to Heller under the name of Foreign Textile Corporation, as follows:        " *Nov.* 12, 1919.

" Foreign Textile Corporation,
        " Edmund Wright-Ginsberg Co.,
                " 288 Fourth Avenue,
                        " New York, N. Y.:

" Gentlemen.— Referring to order placed with us for you through William Heller Department under date of November 5th calling for 1500 lbs. of raw Artificial Silk Cloth at $13.50 per pound, terms, cash less 2%, and 3500 lbs. of raw Artificial Silk Cloth at $14.00 per pound, terms, cash less 1%, it is understood and agreed between us that in case you are forced to make any allowance on this material owing to same being made so as to show cross-bars and imperfections making same unmerchantable, that before you make such allowance to the customer that you are to secure from him the very best settlement for said allowance and before making said allowance, you are to submit same to us and we have the option of granting said allowance or accepting the return of the said pieces of goods at the same price that we billed the goods to you plus the charges for the dyeing per pound.

" It is further understood and agreed that if these goods are not merchantable owing to the material showing cross-bars or imperfections making same unmerchantable, then you have the privilege of returning to us such of these goods as are imperfect at the invoiced price plus the dyeing charges.

" COHEN BROTHERS MFG. CO., INC.
                        " I. P. Cohen, *Pres.*
                        "Accepted W. Heller."

**206** Cohen Bros. Mfg. Co., Inc., *v.* Wright-Ginsberg Co., Inc.

First Department, November, 1923. [Vol. 207

This was followed by the letter of November fourteenth, which is the basis of the suit.

From the foregoing summary it is apparent that at the very outset of the case there was sharply and clearly presented the question of whether there was any consideration for the giving of the guaranty in question.

Upon the testimony of I. P. Cohen and David Cohen, and the direct examination of Aaron Cohen, the contract with Heller was not drawn, signed or delivered until after defendant had agreed over the telephone to guarantee Heller's purchase from plaintiff; the making of the contract with Heller was induced by, and was the consideration for, defendant's guaranty.

Upon the testimony of Heller the contract between him and plaintiff had been executed and delivered to him before there was any talk of a guaranty, which question arose when he said the goods were being purchased for account of Foreign Textile Corporation. In this he is completely corroborated by the cross-examination of Aaron Cohen. There is the argument as well to support it, based on the facts (1) that the memorandum of delivery to the textile corporation does not appear on the copy of the contract; (2) the defendant's letter to plaintiff of November seventh refers to a future guaranty; and (3) the written guaranty is dated a week after the contract. Furthermore both Heller and Wright deny that any such telephone conversation as testified to by the Cohens took place.

With this issue as to the existence of any consideration for the guaranty raised, all that the learned trial court charged thereon was as follows: " This is an action on a written guaranty. In a case of this kind the burden of proof is upon the plaintiff to the extent of establishing the fact that the guaranty was given by the defendant. * * *

" The circumstances under which that contract was actually executed present a series of divergent facts. Mr. Cohen's statement, and his brother corroborates him in his testimony, is that they discussed the subject-matter of the contract and that before it was written out a telephone message was sent to Mr. Wright, of the Edmund Wright-Ginsberg Corporation, asking him if he was willing to do as Mr. Heller said he would be willing to do and, that is, guarantee the purchase to be made by Heller. According to Mr. Cohen, the reply was yes. Thereupon the contract was drawn. But after the contract was signed, Mr. Heller then notified Mr. Cohen that he would like to have the goods consigned and billed to this Foreign Textile Corporation.

" If that is what was said between the parties, gentlemen, that

Cohen Bros. Mfg. Co., Inc., v. Wright-Ginsberg Co., Inc.  **207**

App. Div. 199]     First Department, November, 1923.

would not constitute an assignment of this contract in any sense. That would be, at most, nothing more than following out a request or the instruction of a purchaser to make a delivery at a certain place, and to send the bills in a certain way. Mr. Heller insists that the contract was fully drawn, and the name of the Foreign Textile Corporation inserted as the party to whom the delivery was to be made, written on the contract, and that it was then that Mr. Cohen asked for a guaranty. Mr. Heller denies, as I recall it, any telephone conversation between Cohen and Wright at the other end. We now come to another step. This contract was signed. Both Cohen and Heller admit the signatures. Within a day or two the defendant in this action wrote a letter to Cohen to the effect that he had been asked to guarantee, or referring to the guaranteeing of the contract, and expressing a willingness to do so when Heller approves of the quality of the goods.  \*  \*  \*

" Contracts of guaranty, gentlemen, are to be construed according to what fairly appears therefrom to have been the contemplation of the parties at the time the contract was given. We have Mr. Wright's testimony that he had talked this matter over before he signed this contract, that his compensation was four per cent. of the transaction and that he had this letter of the twelfth before him as well as the order, when he signed it. A guarantor of payment is limited in his defenses in an action at law to those defenses which would be applicable to the buyer, but not what we call counterclaim. That is, there are many things like damages for breach of warranty and those like remedies which a buyer might have against a seller, but the man who guarantees the payments of a bill of goods cannot have that as a defense, but he is entitled to defend his action on this ground, if there never was any delivery, he can show that; I mean, no pretense at any delivery at all; if a man bought artificial silk and there was a delivery of seal skin sacks, he could show that; he could also show that the delivery of the article that was made, as a pretended delivery under the contract, was not the article called for by the contract, or were not merchantable goods, and that is the defense that the defendant is limited to in this action, except the other claim that is made by the defendant that there was no consent on the part of Wright to the delay in the delivery up to the end of February, to which express consents were claimed.

" You will remember that Mr. Cohen and Mr. Wright told absolutely directly opposite stories as to whether or not there was a conversation over the telephone on November 5th, the day of the contract. Either there was or there was not. If there was such a telephone message in reference to this on November 5th,

**208** Cohen Bros. Mfg. Co., Inc., *v.* Wright-Ginsberg Co., Inc.

First Department, November, 1923. [Vol. 207

then the fact that there was a delivery of goods afterwards, or a written contract afterwards, would not make the slightest difference, the guaranty would be good, and incidentally to that, there is no question about it but that on November 7th there was a letter written by Mr. Wright in reference to this order and guaranty which he contemplated giving in reference to Mr. Heller's contract, and that it was subsequently followed by the guaranty on the 14th. I shall now go to the question of the delay in delivering. A guarantor who agrees to stand back of a contract of purchase by guaranteeing its payment is protected by law, and the law protects him to the extent that that contract shall be lived up to or he shall not be held liable."

The trial of this action was a long and involved one, lasting from May 3 to May 16, 1922, and it may well be that sight had been lost by every one interested of the question of a consideration for the guaranty, for the greater part of the lengthy record is taken up with the dispute as to the merchantability of the goods and whether they had been rejected within a reasonable time. The testimony as to the consideration for the guaranty was given at the outset of the trial. The existence of that issue may well have been forgotten by the jury, and the learned trial court failed to remind them of its existence, though a determination of that issue was vital to plaintiff's recovery. But defendant's counsel presented the question squarely by the following requests to charge:

" 1. If the jury believe the testimony of Mr. Wright that he had no telephone or other communication with Mr. Cohen on November fifth, in which Mr. Wright agreed to give a guaranty, then the jury must find a verdict for the defendant.

" 2. If the jury believe the testimony of Mr. Heller that during all the time he was present at the office of Mr. Cohen on November fifth, including the time up to which the contract of November fifth was signed and delivered, Mr. Cohen made no telephone call whatsoever to Mr. Wright, then the jury must find a verdict for the defendant.

" 3. If the jury believe the testimony of Mr. Heller and of one of the Cohen Brothers that the contract of November 5th, 1919, was signed by both parties and delivered to Mr. Heller and that up to that time there had been no attempt to get into communication with Mr. Wright about any guaranty, the jury must find a verdict for the defendant."

Each of these requests was denied, and their denial constitutes reversible error. As the result of the failure of the learned trial court so to instruct it, the jury was left absolutely without any indication that the existence of a consideration for the guaranty

was one of the issues in this case or that the question of whether defendant had agreed to guarantee Heller's contract with plaintiff before that contract was signed and delivered, was left to them for determination.

The error was emphasized by the long colloquy which took place when the jurors returned for further instructions and for answers to questions put by them in writing and orally, which showed how involved the jury had become in trying to arrive at a conclusion. Nowhere was there a suggestion given them that the existence of a consideration for the guaranty was before them. In fact the issues were then summarized as follows: " The Court: * * * Try to get this into your minds: did or did not the purchaser here act within that time that the law prescribes, which you will find was a reasonable time? Did he, under all of the circumstances proven here, return or offer to return those goods within a reasonable time after they were delivered to him, or did he fail? That particular point of the case must be the determining feature. Mr. Seabury: To that I except. The Court: There are other points in the case, such as delays in the deliveries, which I have already instructed you upon. Now, Judge Seabury, I would ask you in what respect you except to that part of my charge? Mr. Seabury: Because I think it leaves out of consideration the question as to whether the goods were merchantable, which, as I view it, is a very vital point. The Court: Do I understand you to suggest that if the goods were unmerchantable, and that he did not return them within a reasonable time that he would have the right to return them, anyhow? Mr. Seabury: No. I think there are two questions, your Honor, I think, first whether the goods were merchantable and then, whether the buyer returned them within a reasonable time. I think if the jury resolves those two questions in our favor, that ends the case. The Court: And third, if they are absolutely unmerchantable, and do not return them within a reasonable time, the plaintiff must recover."

For the error involved in the failure to properly submit to the jury the issue of lack of consideration for the guaranty sued on, the judgment appealed from must be reversed and a new trial ordered, with costs to appellant to abide the event.

There is another matter to which attention should be called, in view of the fact that in our opinion a retrial of this action is required. One of the bitterly contested issues in the case was whether the goods in question had been rejected by the purchaser within a reasonable time. Section 129 of the Personal Property Law (as added by Laws of 1911, chap. 571), defining what constitutes

**210** Cohen Bros. Mfg. Co., Inc., *v.* Wright-Ginsberg Co., Inc.

First Department, November, 1923.                    [Vol. 207

acceptance, provides: " The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

But this has no application where a different time for acceptance is fixed by special agreement of the parties. Under the letter of November twelfth, from plaintiff to the Foreign Textile Corporation, the buyer was not compelled to reject defective goods immediately or within a reasonable time after delivery. Plaintiff evidently realized from the outset that at least a portion of the goods delivered to the buyer under the contract would be open to the objection that it was unmerchantable. Therefore, by express agreement it allowed the buyer to take in and process the goods and deliver them to the latter's customers. If the customers objected to the quality of the goods, the buyer was to make as good a settlement as possible with the customer by way of allowance, and such settlement was to be submitted to plaintiff, who might either grant it, or accept the return of the goods by the buyer, at cost price plus the charge for dyeing same. The buyer was given the further privilege of returning unmerchantable goods and receiving the cost price plus cost of dyeing. It is apparent that a course of dealing was contemplated by the parties under which the buyer might process the goods, sell them to its customers and make the best terms possible if the customers complained of the quality of the material, which terms the plaintiff might ratify or accept the goods back.

It was not until the purchaser learned that the plaintiff would not carry out the agreement of November twelfth with respect to taking back merchandise rejected by customers that the purchaser had any reason to inspect or reject merchandise still unsold and on hand. The time from which the purchaser might be charged with any obligation to return unsold merchandise ran from the date the purchaser learned the plaintiff would not perform its contract with respect to goods rejected by the purchaser's customers, and not from the time of delivery of the goods. The learned court throughout its charge instructed the jury that in determining what constituted a reasonable time for rejection they must calculate from the day of delivery. This was reversible error.

The learned trial court, when the jury had returned for further instruction, was asked: " The Twelfth Juror: After a reasonable time; that is what we are up against. The Court: What? The Twelfth Juror: Would you name what you call a reasonable time? The Court: Name it? The Twelfth Juror: Yes The Court: No.

I am leaving the question to the jury to determine, under all the circumstances as developed by this evidence, the return or offer to return by Mr. Heller, or being conveyed through Mr. Heller, what ever it was, was done within a reasonable time, he having received the delivery on, I think, it was February twenty-fourth, or twenty-fifth, and the tender was April sixth; the difference being forty-one days. You must take into consideration all the circumstances which would justify the returning of those goods on that day, and was it within a reasonable time, considering all the circumstances in the case. Was there anything intervening in the interval that would amount to such a fact as would justify his waiting by either permission or inference granted by the plaintiff? ''

This charge, it will be seen, contains no reference whatever to the agreement of November twelfth, by which the buyer was to take the goods in without examination, process them and await complaints by its customers before tendering them back to plaintiff, unless plaintiff should show, by its acts, that it did not intend to carry out that agreement, in which case the buyer would have to tender back any unsold goods still remaining in its hands within a reasonable time, the provision as to sales to customers already made still being effective.

The judgment and order should be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., FINCH, McAVOY and MARTIN, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellant to abide the event.